(No. 19405.—

THE PEOPLE *ex rel.* Harry S. Cutmore, Relator, *vs.* GEORGE F. HARDING, County Treasurer, Respondent.

*Opinion filed January 3, 1929—Rehearing denied February 8, 1929.*

JOHN A. SWANSON, State's Attorney, LOUIS H. GEIMAN, and GEORGE A. MILLER, (HAYDEN N. BELL, of counsel,) for relator.

SCHUYLER, WEINFELD & PARKER, (GEORGE W. LENNON, and CARL J. APPELL, of counsel,) for respondent.

Mr. JUSTICE DUNN delivered the opinion of the court:

On December 7, 1928, on motion of Harry S. Cutmore, leave was granted him to file a petition for *mandamus* against George F. Harding, county treasurer of Cook county. The petition was filed and a summons was issued returnable on December 12. The respondent demurred to the petition, briefs were filed and the cause was submitted on December 17 for decision. We announced our decision denying the writ on December 19, but since the business of the term had not permitted the preparation of an opinion, it was announced that one would be filed later setting forth the reasons for our decision. The reasons will now be stated.

All the allegations of fact in the petition are admitted by the demurrer, and they show that the State Tax Commission on July 10, 1928, ordered a re-assessment of all the real property in Cook county assessed in 1927, and that such re-assessment, when made, should be substituted for the original quadrennial assessment made in 1927 for the year 1928, and thereafter until the next general quadrennial assessment. On August 2, 1928, the tax commission amended the rules for the equalization and assessment of property by the addition of a rule designated as rule 14, which was applicable only to counties having a population of more than 500,000 and provided an elaborate system and procedure for the taxation of real estate in such counties. This rule required a permanent public record to be kept and maintained, in which should be recorded the elements or basis of valuation and the things taken into consideration by the local assessment officers in determining the full fair cash value of each town or city lot or parcel of land and each improvement thereon, and the adoption by the local assessment officers of a uniform standard unit of value for "determining the full fair cash value of all town and city lots and parcels of land, which shall be known

and designated as the standard unit foot, and which shall be a strip of land a foot wide and 125 feet deep, or such other standard depth as the local assessment officers shall adopt." The local assessment officers were required to determine the full fair cash value of the strip of land in the middle of each block extending one foot along the street frontage and at right angles to the street, to a depth of 125 feet or such standard depth as the local assessment officers should have adopted, and the value so determined should be the standard unit-foot value to be considered, among other things, in determining the value of each lot or parcel of land in such block fronting on such street. The local assessment officers were also required to cause to be marked on unit-value maps the standard unit value so established for each block of frontage on each street represented on each of such maps. The rule provided in detail the method of determining the value of each lot or parcel of land by the use of such standard unit-foot values recorded on such maps, taking into consideration, also, further elements mentioned in the rule affecting the value of any lot or parcel of land; and also required the local assessment officers to cause to be made a schedule classifying various types of buildings or structures by their use and construction, and to cause buildings and other improvements on each lot or parcel of land to be measured, described and classified as to use and construction, such measurements, description and classification to be entered upon the permanent record of each lot or parcel. The rule contained other requirements which we do not regard as necessary to be set out at length, since those which have been stated are sufficient to indicate the character of the rule and the extent of the changes made in the manner of making the assessment.

On September 4, 1928, the board of assessors of Cook county, in a letter addressed to the county board in re-

gard to the plan for the accomplishment of the work of re-assessment in accordance with the order of the tax commission and to the cost of it, stated that the method to be employed in making the assessment under the rules of the commission called for an entirely different organization and plan of procedure from that theretofore followed or financed by the county board and for authority from the board to employ and pay necessary help. A detailed description of the work to be done was attached to the letter, together with estimated expenditure proposed, from which it appeared that the amount required was $809,375. The county board appropriated this amount, and clerks and deputies of the board of assessors were appointed and employed in the work of making such re-assessment. Among those so appointed and employed from November 1 to November 15 were the following persons at the daily rate specified: Harry S. Cutmore, clerk, director of valuation operations, $75; Clayton J. Young, clerk, publicity specialist, $20; Henry C. Hagedorn, clerk, superintendent of land valuations, $50; Ralph A. Olcott, clerk, assistant superintendent land valuations, $35; Wendell F. Simmons, clerk, supervisor land valuations, $50; Elden D. Pollock, clerk, supervisor land valuation actuary, $50; F. D. Waddell, land valuation actuary, $35; Henry G. Hulbuert, land valuation actuary, $35; Harry P. Moran, superintendent of building appraisal, $50; C. D. Faxon, expert building appraiser, $50; George W. Cutmore, expert building appraiser, $35; W. V. O'Malley, building valuation expert, $35; W. J. Rammer, supervisor of building measurers, $25; B. K. Suttle, supervisor of building measurers, $25. Payrolls were made out and certified by the tax commission to the county board for the compensation of the persons above named for the period stated and were approved by the finance committee of the board and by the board ordered paid. Warrants for their payment were drawn by the comptroller and presented to the respondent, but he refused to

countersign and pay them, for the reason that compensation in excess of $10 a day was not authorized by law.

The Revenue act of 1898 provided for the election of a board of assessors in counties containing 250,000 or more inhabitants, whose duty should be to assess all property in the county, and by section 3 authorized such board "to employ a chief clerk, who shall have charge of the office of such board, and such other clerical help as may be necessary, subject to the approval of the board of review as to the number thereof, who shall hold office during the pleasure of the board, and who shall take and subscribe an oath of office that he will honestly and faithfully perform all duties of such office under the direction of said board, and he shall have power to administer all oaths authorized by law to be administered by assessors, and the compensation of such clerk shall be fixed by such board, subject to the approval of the board of review, not to exceed $10 per day, for each working day." By section 6, as amended, the board of assessors is given power to appoint as many suitable persons as in its judgment are necessary to act as deputies, subject to the approval of the board of review as to the number and time of service of such deputies, to assist them in making the assessment, who shall perform such duties as may be assigned to them by the board of assessors, hold their office during the will of the board of assessors and receive such compensation as shall be determined by the board, not exceeding $7 per day. By section 12 the assessor was required, before the first day of June in the year 1899, and every fourth year thereafter, in person or by deputy, to actually view each tract or lot of land listed for taxation as of the first day of April in each year and assess the same at the value required by law. By the ninth paragraph of section 61 of the Counties act it is provided that "the salaries or rate of compensation of all officers and employees of said county, when not otherwise provided by law, shall be fixed by the board of commissioners and shall

be fixed prior to the adoption of the annual appropriation, and shall not be changed during the year for which the appropriation is made."

It is claimed by the relator that section 3 of the Revenue act limits the compensation of only the chief clerk of the board of assessors to $10 a day; that the rate of compensation of the other clerical help which the board is authorized to employ is not provided by law, and is therefore within the discretion of the county board, by virtue of section 61 of the Counties act, without limitation of the amount. The respondent contends that in the clause, "the compensation of such clerk shall be fixed by such board, subject to the approval of the board of review, not to exceed $10 per day for each working day," the words "such clerk" must be understood, in view of the subject matter and the context, in the collective sense as meaning "any such clerk" and as applying both to the chief clerk and to the other clerical help. He further contends that, however this may be, employees whose compensation is fixed at the rate of $20, $25, $35, $50 and $75 a day are not clerks, although they are so called in the appropriation bill providing for their employment and compensation, but are deputy assessors authorized by section 6 to be appointed by the board of assessors whose compensation may not exceed $7 per day. The duties of deputy assessors are further indicated by the provisions of section 12 of the Revenue act that "the assessor shall, before the first day of June in the year 1899 and every fourth year thereafter, in person or by his deputy, actually view and determine as near as practicable the value of each tract or lot of land listed for taxation as of the first day of April of each year, and assess the same at the value required by law, setting down the sum in proper columns prepared therefor in duplicate books furnished him." The deputy assessor has the same authority to make the assessment of real property as his principal. The assessor need not personally view each tract of land

but he must do so either in person or by his deputy, and the deputy viewing the land is authorized to determine its value and assess it. He is *pro hac vice* the assessor and his act is in law the act of the assessor. Calling him a clerk, as is done in the communication of the board of assessors to the county board and in the resolution of the county board, while the duties imposed on him are those of a deputy, requiring examination, discretion, judgment and determination of value, does not make him a clerk, or authorize him to receive, instead of the compensation which may be provided by law for a deputy, the higher compensation which may be authorized for a clerk.

The board of assessors is created by the statute, from which, alone, its authority is derived. It has no inherent power, and the only assistants which the statute authorizes it to appoint are divided into two classes: one consisting of a chief clerk and other clerical help, who are required to take and subscribe an oath of office that they will honestly and faithfully perform all duties of such office under the direction of said board and shall have power to administer all oaths authorized by law to be administered by assessors; and the other, of deputies, who are required to take the official oath required by the constitution of all civil officers, except members of the General Assembly and such inferior officers as may be by law exempted. The duties of the first class are not expressly prescribed by the statute but they must be clerical—that is, pertaining or relating to a clerk, which is defined in the Standard Dictionary as "an officer of a court, legislative body, corporation, society, or the like, charged with the care of its records, correspondence and accounts; a secretary;" and in Webster's New International Dictionary as "one employed to keep records or accounts; to have charge of correspondence, or the like, with or without administrative, executive or other authority; a scribe; an accountant." A clerk in offices is defined in Bouvier's Law Dictionary as "a person em-

ployed in an office, public or private, for keeping records or accounts. His business is to write or register in proper form the transactions of the tribunal or body to which he belongs." Anderson's Law Dictionary gives the same definition, and it was adopted in *People* v. *Fire Comrs.* 73 N. Y. 442. In Webster's Dictionary it is said that "clerk is an indefinite term of wide application and may include employees clothed with authority to act in various weighty matters for their employer, such as the teller of a bank or the secretary of a corporation, as well as those whose duty is the keeping of the simplest records." In the Revenue act, however, there is found no indication that clerks of a board of assessors may be charged with executive powers, or powers other than the ministerial functions usually pertaining to the office. The statute which provides that deputy assessors may be appointed having the *quasi*-judicial powers involved in the assessment of property and that they are required to take a different oath from clerks, is inconsistent with the conferring of such powers upon clerks and indicates that the two classes of employees are exclusive of one another.

In *City of Chicago* v. *Luthardt*, 191 Ill. 516, Luthardt brought an action in assumpsit against the city to recover his salary, at the rate of $1500 per annum, as chief clerk of the detective bureau of the department of police from April 1 to December 31, 1898, and recovered a judgment therefor. He had held this position from November, 1896, to March 31, 1898, when he was dismissed from his position, and from that date the chief of police refused to allow him to perform his duties until January 1, 1898, when he was restored to his position by writ of *mandamus* because the attempt to dismiss him and deprive him of his position was ineffectual. The city council had attempted to discontinue or abolish the office by failing to make an appropriation for the plaintiff's salary in the appropriation bill for the year 1898 under the name of chief clerk of the detective

bureau of the department of police, but changed the name thereof to secretary of the chief of detectives, rank of lieutenant, without in any way changing the duties of the office, and made an appropriation of $1500 per annum for the salary of said office of chief clerk under the name of secretary of the chief of detectives, rank of lieutenant. The court held that the fact that the appropriation was made under the name and style of "secretary of the chief of detectives, rank of lieutenant," the duties of the office and the salary being the same, could make no difference, and affirmed the judgment in favor of the plaintiff. So the action of the board of assessors in calling the deputy assessors appointed by it by the name of clerks instead of deputies could make no difference in the rate of their compensation. The limit of compensation fixed by the statute for deputy assessors could not be evaded by this device.

It is manifest from the communication of the board of assessors to the county board setting forth the changes in the method to be employed in making the assessment under the order of the State Tax Commission, and from the resolution of the county board agreeing to incur and pay the necessary expenses for the proposed re-assessment and appropriating the sum of $809,375 for that purpose, the detailed items of which were set out in the estimated expenditure plan submitted by the board of assessors, that the duties of the persons for whom compensation in excess of $10 per day was provided, were the duties of deputy assessors and not of clerks. It was stated in the communication to the county board: "(2) It is important that in setting up this organization and plan that the work be done in a thoroughgoing and complete fashion since it becomes the basis for a new mode of assessing, and in subsequent years the board of assessors will be called upon to merely keep the plan thus inaugurated up to date. Accordingly, it is imperative that the gathering of the information, and the records compiled therefrom, shall be complete and ade-

quate in every detail, so as to provide a permanent basis for this new type of assessment administration. (3) The board believes that in undertaking to carry out this order the work should be so organized and performed that the entire community will have confidence in the results, that the large expenditure of money authorized will be fully justified, and that the provisions of the State Tax Commission's order will be fully carried out. To accomplish this objective the board of assessors proposes to establish under this appropriation the following program: (*a*) To engage the services of some recognized consulting specialist in the field of appraising of real estate for taxation purposes. Such an arrangement contemplates the use by the board of assessors, as adviser to them in their work, of such a consultant and his staff in gathering the information concerning real estate, in the preparation of the forms and records incident thereto, and in supervising, under the direction of the assessors, of the general operation of all of the work involved in complying with the order of the State Tax Commission and the rules recently prescribed in connection therewith. (*b*) We propose to designate an advisory committee on employment, to advise with the board of assessors in the selection of properly qualified employees to do the important technical work involved. Such an advisory committee will consist of the consulting specialist above referred to, the director of the appropriation budget hereinafter referred to, and the chairman of the joint commission on real estate valuation or his representative. (*c*) We propose further to ask the consultant efficiency officer of the county board to advise with and report to the board of assessors in the expenditure of this appropriation and the future guidance of the work of the board of assessors. (*d*) The board of assessors submits the following exhibits furnishing further detail as to the nature, scope and character of the work to be done and the estimated expenditure plan:

Exhibit 'A'—Detailed description of the work to be done; Exhibit 'B'—Estimated expenditure plan."

The detailed description of the work to be done, as shown in Exhibit "A," included the establishment of appraised land values throughout urban and suburban territory of Cook county through research, sales analysis and judgment of staff of land valuation experts. Tentative values to be submitted at meetings of property owners for review and criticism prior to adoption of final unit values. Preparation and publication of final unit-value maps. Computation of individual lot values. Establishment of acreage values. Preparation of a schedule of cost factors and classification of typical buildings of all general types in Cook county upon the basis of the local present cost of construction for labor and material, by conferences between building valuation engineers of the board of assessors and local committees of architects, contractors and material-men. Description of all buildings in Cook county upon special building classification sheets. Classification and estimation of the replacement cost factors per square foot of floor area, or per cubic foot of volume, of each building by competent building valuation men working under the instruction and close supervision of building valuation engineers. Computation of the replacement cost, new, of each structure upon the basis of the classification cost factor established and its depreciation for age, condition, obsolescence, lack of utility and other causes. Deduction of such allowances producing a present sound value on each structure. Other details were included in the description of work to be done.

Based on this description of the work to be done, Exhibit "B" (the estimated expenditure plan) included one clerk as general superintendent of land valuation operations; one clerk as publicity specialist; one clerk as general superintendent of land valuation; one clerk as assistant superintendent of land valuation; eighty-eight clerks on real estate committees of two each, in unit-map districts

of the city of Chicago; one hundred and sixty clerks on real estate committees of two each, in suburban and rural areas; four clerks as supervising land valuation actuaries to co-ordinate efforts of real estate committees in city, suburban and rural areas; twenty clerks as land valuation actuaries, to assist in co-ordinating efforts of real estate committees in city, suburban and rural areas; one clerk as superintendent of building appraisal; four clerks as building valuation experts for general assignment in applying price and depreciation factors under the direction of the superintendent; five clerks as expert building appraisers, to work under assignment by the superintendent in valuation of high-grade office, commercial and industrial buildings; sixteen clerks as supervisors of field measures; thirty-two clerks as building appraisal experts, to apply building price factors and depreciations,—all at prices ranging from $20 to $75 a day. All these duties are those which section 12 of the law imposes upon the assessors, requiring them, in person or by deputy, to actually view and determine, as near as practicable, the value of each tract or lot of land listed for taxation as of the first day of April of each year and assess the same at the value required by law. They do not constitute the mere gathering and recording of information. They are in no sense clerical duties but are of the essence of the duty of the assessor in actually viewing and determining the value of each tract or lot of land and assessing the same at the value required by law. The law authorizes the appointment of deputy assessors, with power to determine the value of each tract of land and assess it, but does not authorize the employment of any other persons for that purpose. Neither the county board nor the board of assessors has authority to contract for the services of persons other than assessors or regularly appointed deputy assessors to assess property for taxation. The statute having designated the officers for the discharge of the duty of assessment and provided for the compensation they shall

receive, neither the board of assessors nor the county board has any power to enter into a contract with any other person to perform that duty. (*Stevens* v. *Henry County*, 218 Ill. 468; *People* v. *Kankakee and Seneca Railroad Co.* 265 id. 497; *State* v. *Fry*, 77 Kan. 540; *Chase* v. *Commissioners of Boulder County*, 37 Colo. 268; *Grannis* v. *Board of Commissioners*, 81 Minn. 55; *Storey* v. *Murphy*, 9 N. D. 115; *House* v. *Los Angeles County*, 104 Cal. 73; *Platte County* v. *Gerard*, 12 Neb. 244.) Since no authority exists in the law for the payment of compensation to the relator or the other persons mentioned in the petition at a greater rate than that fixed by the statute the writ was denied.

Elme Erb Heidenway brought a bill in the circuit court of Cook county for an injunction restraining the assessing officers of Cook county from incurring any expenditures, and the disbursing officers from paying any funds of the county, for the making of the re-assessment ordered by the State Tax Commission. The commission was also made a party defendant. The court rendered a decree dismissing the bill for want of equity, from which the complainant appealed to this court, her appeal being for hearing at the next February term. She made a motion that she be allowed to intervene in this cause and be made a defendant, and that her counsel be permitted, as *amici curiæ,* to file in this cause the brief filed by them in her appeal, in which the constitutionality of the provisions of the statutes under which the State Tax Commission acted in ordering the re-assessment is challenged. Her motion to intervene and be made a defendant was denied but her counsel were permitted to file the brief as *amici curiæ.* We have, however, given no consideration to this brief, because, regardless of any constitutional question, the petition shows no right to the writ of *mandamus.*                     *Writ denied.*